| | |
|---|---|
| | **UNITED STATES DISTRICT COURT** |
| | EASTERN DISTRICT OF CALIFORNIA |
| ADAM VALDOBINOS, | 1:11-CV-00619 GSA HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND CLOSE CASE |
| ANTHONY HEDGPETH, | |
| Respondent. | ORDER DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c).

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Stanislaus, following his conviction by jury trial on July 7, 2008, of second degree murder (Cal. Penal Code § 187). (See Lodged Doc. No. 4.) The allegation that Petitioner had used a knife in the commission of the offense was found true. (See Lodged Doc. No. 4.) On August 8, 2008, he was sentenced to an indeterminate term of 15 years to life. (See Lodged Doc. No. 4.)

Petitioner appealed his conviction. On October 27, 2009, the California Court of Appeal,

Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned decision. (See Lodged Doc. No. 4.) Petitioner then filed a petition for review in the California Supreme Court. (See Lodged Doc. No. 5.) On January 13, 2010, the petition was summarily denied. (See Lodged Doc. No. 6.)

Petitioner also sought collateral relief in the state courts. On April 9, 2010, he filed a petition for writ of habeas corpus in the Stanislaus County Superior Court. (See Lodged Doc. No. 7.) The petition was denied in a reasoned decision. (See Lodged Doc. No. 8.) On July 8, 2010, he filed a habeas petition in the Fifth DCA. (See Lodged Doc. No. 9.) The petition was summarily denied on October 7, 2010. (See Lodged Doc. No. 10.) On October 21, 2010, he filed a habeas petition in the California Supreme Court. (See Lodged Doc. No. 11.) On December 15, 2010, the petition was summarily denied. (See Lodged Doc. No. 12.)

Petitioner filed the instant federal habeas petition in this Court on January 19, 2011. He contends he received ineffective assistance of counsel in violation of his constitutional rights. On September 6, 2011, Respondent filed an answer to the petition. On October 11, 2011, Petitioner filed a traverse.

## STATEMENT OF FACTS[1]

Nicole Marie Walker was the prosecution's main witness at trial. Walker testified that, on October 12, 2003, she went to a house occupied by Kenni Nunez to meet her friend, Nathaniel Helton. She wanted Helton to give her drugs and loan her money for a motel room that night. Walker was accompanied by her friends, Mondre Caldwell and Maurice Purnell.

Helton was not at the Nunez house, so Walker called Helton on the phone. Helton told her to meet him at the Cameron Villa apartment complex. At some point on the way to meeting Helton, Walker found out that Helton was unhappy that she had taken Black people to the Nunez house. Helton told her not to "bring niggers to my house."

Walker and her friends pulled into the driveway of the apartment complex, and her friends dropped her off on the southeast corner. Walker then called Helton to meet her. Helton, Joe Godinez and someone she knew as "the Grinch" (later identified as [Petitioner]) came up to her and she began talking to Helton. She was approximately five feet away from "the Grinch." Meanwhile, her friends drove past where she was standing and turned a corner so Helton and the others could not see them.

---

[1] The Fifth DCA's summary of the facts in its October 27, 2009, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the Fifth DCA.

1          Jesse Watson, a Black man, had come to the apartment complex to look for his nephew who was supposed to be at his niece's apartment in the Cameron Villa complex. Watson drove up to Walker, Helton, Godinez and [Petitioner], got out of his car and approached them. Walker testified that someone from her group said, "Who is that?" Watson replied, "Oh, I'm sorry, I thought you were my niece's group" or "[m]y niece's crew." Someone from the group said, "Do we look black?" Watson replied, "Oh, you could look black and blue" or "some stupid joke or something." Walker testified that "the Grinch" fatally stabbed Watson right after Watson uttered his joke. Watson put his hands up, stepped backward and tripped over the cement parking curb.

           Someone then yelled, "Come on." According to Walker, she responded by screaming, "That's F'd up." She went to help Watson and at that point realized the seriousness of his injury. She initially thought that he was punched. The rest of the group then ran away through the apartment complex.

           Walker went back to her car and Watson followed her. She got into the car with her companions. As they started to drive away, the driver said, "Well, we can't just leave him here." So they called 911 a few times, told the 911 operator that there was a man bleeding in a parking lot and then drove off.

           That night Walker spoke with one of her friends about the incident. She had described "the Grinch's" appearance to her friend. Walker recalled that "the Grinch" was wearing a black and white, either plaid or checkered, button-up collared shirt made of a silk-like material or cotton, and either dark blue or black jeans. Her friend told Walker that "the Grinch's" name was Adam Valdobinos and described him.

           The next day, Walker heard that Watson had died and received messages on her phone from the police indicating that they needed to talk to her. She met with Officers Al Brocchini and Ray Coyle at an IHOP restaurant, after which they went to a police station. Initially, Walker did not tell the police that she was with her boyfriend, Mondre Caldwell, because he was on bail and she did not want to get him involved. The officers showed her a picture of [Petitioner], which she identified as "the Grinch."

           During Walker's second conversation with the police, she told officers that the person who stabbed Watson was "the Grinch." They showed her a photo array and she identified [Petitioner] as the stabber. Walker also identified [Petitioner] in a live lineup, one and a half years later.

           Walker also testified that, at the time of the trial, she was awaiting sentencing on several felony counts and would be spending a year in jail on three of those offenses. She further testified that, after the homicide in this case occurred in 2003, she was accepted into the California State Witness Protection Program. The state paid Walker's housing costs from October 2003 until June 2006, but she was terminated from the program following her arrest.

           On cross-examination, Walker testified that she deliberately misled the police officers during the first interview. She did not tell them that she was going to the apartment complex to buy drugs. She withheld the names of her companions. She told the detectives that she did not know if she could recognize the man who stabbed Watson because he ran away, it was dark, and she was talking to Helton so her attention was diverted. Walker also told the officers that three persons were with Helton, when actually there were only two people. She volunteered that, since the guy who did the stabbing was short, it might have been Robert Cuevas, a friend of Helton.

           Walker testified that she was uncooperative initially because she did not want to

3

get involved. However, as she learned about the victim, she "started feeling really bad" so she began to cooperate. Later, Walker learned that she was distantly related through marriage to Watson's common-law wife. Walker also testified that she used methamphetamine at the time, but not on the night Watson was stabbed.

Mondre Caldwell also testified at trial. He was with Walker and Purnell at the apartment complex and saw a Black man who was hurt. The man was on top of the car that they were driving. Caldwell saw blood on his hand after he removed the man from the car. He could not remember anything else because he was drunk at the time.

Dr. Jennifer Rulon, a forensic pathologist who performed the autopsy on Watson, testified that death resulted from multiple stab wounds and bleeding.

Nathaniel Helton testified and denied that [Petitioner] was present when he met Walker. Instead, he told the police that he ran into two men looking for a girl and that one of them had stabbed a Black man. Neither of the two males was [Petitioner].

**Defense**

The defense presented testimony from Officer Al Brocchini and Dr. Scott Fraser.

Officer Brocchini testified that, at the first interview, Walker told him that she did not know the individuals who were with Helton the night of the stabbing. However, several days later she called the police after talking with her friends and said [Petitioner] was the stabber. During the photo lineup, Walker also identified another individual as being similar to the person who did the stabbing. The individual was a person of interest in the case.

Dr. Fraser was previously qualified as an expert witness in the areas of memory, eyewitness identification and human night vision. He testified that there was essentially a full moon on the night of the incident. He also arranged to recreate the lighting conditions on the night of the incident. Dr. Fraser testified that the lighting conditions at the time of the stabbing may have caused the people Walker saw to be backlit or "photo [occluded]," making them appear as black bodies. Additionally, Dr. Fraser testified that lack of focus on an individual and distractions by others in a group can affect a later identification.

Dr. Fraser also is an expert in psychopharmacology, and he testified that he has studied the effects of methamphetamine on the human brain. He testified that persons on methamphetamine have greatly impaired perception, and they have very unreliable recall and recognition.

Given a hypothetical about Walker's position, actions, and the environmental conditions, Dr. Fraser testified that Walker would not see anything that could be used to recognize individuals. In his expert opinion, Walker's identification of [Petitioner] as the man that stabbed Watson was not reliable without independent corroboration.

(See Lodged Doc. No. 4.)

## DISCUSSION

I. <u>Jurisdiction</u>

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

4

or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Stanislaus County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lockyer v. Andrade,  538 U.S. 63, 70 (2003); Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008 (1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     Standard of Review

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624 (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously

6

or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75-76. The writ may issue only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington, 131 S.Ct. at 784. In other words, so long as fairminded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669 (9th Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1). However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

III.   Review of Petition

Petitioner alleges he was denied the effective assistance of counsel in violation of his constitutional rights. Petitioner complains that defense counsel failed to introduce two potential witnesses, failed to present evidence of D.N.A. results or obtain an independent evaluation of forensic evidence, and failed to challenge the sole witness identification with any pretrial

motions.

Petitioner presented this claim in a habeas petition to the Stanislaus County Superior Court where it was rejected in a reasoned decision. (See Lodged Doc. Nos. 7, 8.) Petitioner then presented the claim to the Fifth DCA in a habeas petition. The petition was denied without comment. (See Lodged Doc. No. 10.) He then presented the claim in a habeas petition to the California Supreme Court where it was also denied without comment. (See Lodged Doc. Nos. 11, 12.) When the California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to a court below that has issued a reasoned opinion. Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991). In this case, the superior court provided the last reasoned decision. In rejecting the claim, the superior court stated:

> The Court, having presided over the Jury Trial, does not find that Petitioner suffered any prejudice based on his claim. Based on the evidence presented at Trial, the Court does not find there to be a reasonable probability that a more favorable outcome would have resulted.

(See Lodged Doc. No. 8.)

The law governing ineffective assistance of counsel claims is clearly established. Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Harrington v. Richter, *supra*, 131 S.Ct. at 787; Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Harrington, 131 S.Ct. at 787, *citing*, Strickland, 466 U.S. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. Judicial scrutiny of

counsel's performance is highly deferential.  A court indulges a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington, 131 S.Ct. at 787, *quoting*, Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," Strickland, 466 U.S. at 694.  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" Harrington, 131 S.Ct. at 787, *quoting*, Strickland, 466 U.S. at 693.  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Harrington, 131 S.Ct. at 787-788, *quoting*, Strickland, 466 U.S. at 687.  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Establishing that a state court's application of Strickland was unreasonable under 28 U.S.C. § 2254(d) is very difficult. Harrington, 131 S.Ct. at 788.  Since the standards created by Strickland and § 2254(d) are both 'highly deferential,' when the two are applied in tandem, review is 'doubly' so. Harrington, 131 S.Ct. at 788, *quoting*, Knowles v. Mirzayance, 556 U.S. 111, ___, 129 S.Ct. 1411, 1420 (2009).

In this case, Petitioner complains that defense counsel prejudicially erred by failing to introduce two potential witnesses at trial.  In his petition, he does not identify these witnesses or how they could have aided his defense.  In his traverse, he names several individuals who he argues could have aided the defense.  However, one of those individuals, Nathaniel Helton, was in fact called as a witness by the prosecution and testified at trial. (RT[2] 173.)  During his testimony, he was cross-examined by Petitioner's attorney. (RT 199.)  Petitioner fails to demonstrate why it would have been necessary or important for defense counsel to also call

---

[2]"RT" refers to the Reporter's Transcript on Appeal.

Helton as a defense witness. In other words, Petitioner does not state what testimony Helton could have provided on direct examination that counsel could not have or did not in fact elicit on cross. In addition, Petitioner does not show how the information, whatever it may be, would have affected the outcome of the trial. The evidence of Petitioner's guilt was strong and included eyewitness testimony. There is no reasonable probability that the outcome of the trial would have been different had Helton's testimony been further corroborated.

Petitioner also names several other individuals who counsel allegedly could have, but did not, call as witnesses. Again, some of the individuals Petitioner names did in fact testify at trial. Moreover, Petitioner merely speculates on the additional testimony that these other individuals might have provided. He claims that their testimony might have corroborated the testimony of Helton. He also claims the individuals could have offered more information on the circumstances of the eyewitness's identification. Petitioner's arguments are mere speculation and insufficient to demonstrate error by counsel. Moreover, Petitioner completely fails to show how the failure to call or further question these witnesses prejudiced him in any way, that is, he fails to demonstrate that the outcome of the trial would have been any different.

Petitioner also faults counsel for failing to investigate the D.N.A. test results regarding beer cans found at the scene. Respondent correctly notes that Petitioner offered no details on the D.N.A. test in his petition. In his traverse, Petitioner states a D.N.A. test was conducted on a beer can found at the scene. He claims the beer can evidence was significant because Petitioner's D.N.A. was not discovered on the can, but the D.N.A. of another individual, Cipriano Salazar, was. He states the eyewitness had stated that Petitioner had been drinking beer before the incident; therefore, the lack of Petitioner's D.N.A. on the recovered beer can calls her testimony into question. Petitioner's argument is meritless. The record shows that numerous beer cans were found at the scene, and the eyewitness had stated that several males had been drinking beer before the incident. The fact that Petitioner's D.N.A. was not discovered on the particular beer can tested does not eliminate Petitioner from being at the scene and does not call the eyewitness's testimony into question. Therefore, Petitioner fails to demonstrate error by counsel or prejudice resulting from the alleged error.

Finally, Petitioner argues counsel failed to file pretrial motions to exclude the identification by the eyewitness. As correctly argued by Respondent, the witness simply testified to what she had seen. There was no basis for a motion to exclude her testimony. Failure to make a meritless motion is not error, and the absence of a meritless motion cannot demonstrate prejudice.

In sum, the state court rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent as set forth in Strickland v. Washington, 466 U.S. 668 (1984). See 28 U.S.C. § 2254(d)(1). The petition must be denied.

## CERTIFICATE OF APPEALABILITY

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> >
> > (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**ORDER**

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2) The Clerk of Court is DIRECTED to enter judgment and close the case; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **December 16, 2011**           **/s/ Gary S. Austin**
                                         UNITED STATES MAGISTRATE JUDGE